THE DEPARTMENT OF PUBLIC WORKS AND BUILDINGS, Petitioner-Appellee, Cross-Appellant, *v.* EXCHANGE NATIONAL BANK, as Trustee, *et al.,* Defendants-Appellants, Cross-Appellees.

(No. 73-144;

Second District (2nd Division)—August 18, 1975.

90

Burke, Gordan & Weber, of Chicago (Thomas T. Burke and Robert J. Weber, of counsel), for appellants.

William J. Scott, Attorney General, of Chicago (John W. Damisch and Theodore W. Wrobleski, Assistant Attorneys General, of counsel), for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

This is an appeal by the defendants and cross-appeal by petitioner from judgments entered in an eminent domain proceeding held in the Circuit Court of Du Page County. Defendants' appeal concerns a pretrial order restricting the evidence of valuation of the property taken to R-2 Single Family Residence. The cross-appeal concerns damages to the remainder of the property not taken.

## THE DEFENDANT'S APPEAL

This matter arises from the trial of a condemnation case wherein the Department of Public Works and Buildings of the State of Illinois petitioner-appellee–cross-appellant (hereinafter referred to as "the State") acquired approximately 16 acres of land located at the southwest corner of Lake Street (U.S. Route 20) and Illinois Route 53 in the village of Addison, Du Page County, for Federal Aid Highway 61. The petition to condemn was filed October 20, 1969. On April 13, 1970, the

State acquired title to the 16 acres (hereinafter referred to as the "part taken"), pursuant to the provisions of the Eminent Domain Act (Ill. Rev. Stat., ch. 47, § 2.1 *et seq.*).

The part taken was a part of a larger 70-acre tract (hereinafter referred to as "the subject premises"—see diagram), title to which is held by defendant-appellant–cross-appellee, Exchange National Bank of Chicago, as trustee under Trust No. 21534. Defendants-appellants–cross-appellees, G. Dana Tokoph and Alice K. Tokoph, are the beneficiaries of that land trust.

Prior to condemnation, the subject premises had 1538 feet of frontage on the south side of Lake Street (U.S. 20) and 1363 feet of frontage along the west side of Illinois Route 53. The subject premises is bisected by an underground pipeline easement running from east to west from a point about 500 feet south of the intersection of Route 53 and Lake Street to a point 1330.4 feet south of the south line of Lake Street on the westerly line of the property. It is also bisected by a Commonwealth Edison high line right-of-way about 250 feet wide running in a west-southwesterly direction across the property from a point approximately 906 feet south of the intersection of Route 53 and Lake Street on the east line of the subject premises to a point approximately 2515 feet south of the south line of Lake Street along the west line of the subject premises. The subject premises does not include a 1-acre parcel of land at the corner of Lake Street and Route 53, which is zoned for and used as a service station.

A brief history of the defendants' interest in the subject premises is necessary. In September 1967, Mr. Tokoph, a developer, became aware of the property through Mr. Anthony Ross, a banker and developer from Addison, who then owned a partial interest in the north 450 feet. Mr. Ross at that time had negotiated with the Kresge Company for the sale of 10 acres of land at a price of $300,000 for a K-Mart to be located on Mr. Ross' property at the southwest corner of Lake Street and Route 53. However, Mr. Ross' ownership was insufficient to accommodate K-Mart design requirements, whereupon Mr. Tokoph and Mr. Ross entered into a joint venture agreement to develop the whole subject premises together with 40 contiguous acres to the south, which at the time was owned by Apollo Savings and Loan Association.

The defendants later acquired title to all this property including the north 450 feet fronting on Lake Street. The assemblage totaled 110 acres.[1]

After acquiring an interest in the 110 acres and to consummate the

---

[1] In December 1968, the trust sold the south 40 acres to Caron Construction Co. These 40 acres were not involved in the condemnation.

ROUGH DIAGRAM OF
SUBJECT PREMISES.
(NOT TO SCALE)

agreement with K-Mart, the defendants caused a petition to be filed with the village of Addison requesting annexation of the 110 acres and zoning upon annexation, pursuant to an annexation agreement. After the required public hearings were held and on March 18, 1968, the village of Addison passed an ordinance authorizing the president and village clerk to execute an annexation agreement with the owners of the subject property.

The agreement, as amended, provided for annexation of the 110 acres to the village of Addison and for zoning as follows:

Parcel A—the south 40 acres—R-2 Single Family

Parcel B—the middle 56 acres—R-3D General Residence
(multiple)

Parcel C—the north 14 acres—B-3 Service Business district

The amended agreement further provided that the city would supply the necessary utility services; however, the owners were required to donate certain lands for public use, submit a preliminary plat for the single-family area, and pay annexation fees. A later amendment to the agreement allowed the owners to make a cash contribution to the village in lieu of the land donation.

In accordance with this written agreement, on April 15, 1968, the Village Board passed an ordinance annexing and rezoning the subject premises. However, the ordinance contained a further provision:

"Section (4). That if any of the territory hereby annexed and hereby zoned are within the proposed Right-of-Way for I-161, and it becomes necessary for the Department of Public Works of the State of Illinois to acquire any such property by eminent domain, that the zoning classification of said property will revert to R-2 Single Family Residence District. Said reversion will be as of the date that notification is received by the petitioners, and the Village of Addison from the Department of Public Works that said property is to be used for said Right-of-Way."

The addition of section 4, which was not contained in the annexation agreement, was the result of a question put to Mr. Anthony Ross by village president Warthen at the March 18, 1968, meeting of the Village Board of Trustees. As stated in the record of minutes of the meeting:

"President Warthen asked of Mr. Ross whether he would agree not to build in the proposed right-of-way of I-61 until the Village and State Highway Department agreed to it; also, whether he would agree that when the right-of-way is purchased, those portions of the R-3 and B-2 within the right-of-way would revert to R-2 zoning, explaining it was in the public interest on a cost basis. Mr. Ross agreed.

Trustee Hurley made a motion, seconded by Trustee Walley, that the Pre-annexation Ordinance be adopted as read, with provision in the Annexation Ordinance that any properties so annexed that fall within I-61 right-of-way revert to R-2 and also that no building be constructed within proposed right-of-way without agreement of the Village and State Highway Department."

On March 18, 1969, proposed rights-of-way for Route 61 were located one-fourth to one-half mile east of Route 53 and east of the subject premises and had been so located for years. When the annexation ordinance was passed by the Village Board on April 15, 1968, the proposed right-of-way for FAI Route 61 was to cross Lake Street east of Route 53 and did not touch any portion of the subject premises.

Within a month after the annexation and zoning of the subject premises, the State of Illinois announced at a public hearing (May 10, 1968), that a new proposal for the right-of-way for Route 61 was being made and that the new route would cross Lake Street just west of Route 53 and would cross through the subject premises. After the public hearing and after consideration by the Department of Public Works, the new center line of Route 61 was recorded with the Du Page County recorder on June 19, 1968, and the route received the approval of the Federal Government on July 18, 1969. The Federal approval was a prerequisite to the validity of the scheduled route.

The village of Addison zoning ordinance map for the year 1969, the zoning ordinance in effect at the time of the filing of the petition to condemn in this case, shows the property in question zoned B-3 and R-3D and *does not* indicate any R-2 zoning on the property which is the subject of this law suit.

After the location of Route 61 was changed, the State assigned appraisers to value the property to be taken in the proposed condemnation. The appraisals were made in August of 1968, about 14 months prior to the filing of the condemnation petition. At that time, the southerly 40 acres had not yet been sold and, the State appraisers valued the property taken, in form, as if it was three separate parcels. In the body of the appraisals, each of the appraisers treats the property in question as a single ownership.

Both State appraisers state in their appraisals that in their opinion (under a heading which they designate "First Assumption"), the highest and best use of the property in question is commercial and multiple in accordance with its zoning. In the body of the appraisals, the appraiser Fitts comments on page 7 of his appraisal:

"In my opinion the highest and best use certainly follows the zoned areas, since those will develop the greatest net return to

the land and would be in keeping with the needs of the community, as well as the general over-all plan. This particular portion of the business zoning on the Lake Street and Route 53 intersection is the best in the local area because it is not cut up by the transmission line or pipeline easement and does not have frontage on the two major highways. The other land in the vicinity is not quite as desirable, and the subject thus has the edge over all others in the vicinity."

Both State appraisals also contain a cover page indicating that the ultimate determination of "approved" valuation was based on the opinion of Richard E. Quinn, who is a special assistant attorney general in Peoria, Illinois, that "the property taken for right-of-way should be valued on the basis of R-2 (Single-Family) zoning."

The impact of the State's decision on the fair cash market value of the subject premises is demonstrable in the State's appraisals. One of the original State appraisers, Donald Sutte, valuing the part taken as zoned for commercial and multiple-family uses, said the fair cash market value was $342,000. Jay Fitts, the other original State appraiser, said the fair cash market value of the part taken was $334,156. These opinions of value were given as of June 1968, 14 months prior to the valuation date, and did not consider the appreciatory effect of sewer and water which were brought to the subject premises during that 14-month period.

On October 20, 1969, the petition to condemn was filed. On January 13, 1970, the State acquired title to the part taken. On January 18, 1971, the defendants filed a cross-petition alleging damages to the remainder, and the State moved to continue the trial.

On April 12, 1971, the State filed a motion for simplification of the issues and requested a ruling "that the annexation and zoning ordinance is valid and binding on the defendants and that the evidence of zoning and compensation for the part taken be limited to R-2 single-family zoning value." [2]

Also on April 12, 1971, the defendants filed a motion praying for an "order directing the Department of Public Works and Buildings of the State of Illinois to appraise the (part taken) in accordance with the B-2 (business) and R-3D (multiple-family) zoning classifications of the Village of Addison, Illinois." The defendants also replied to the State's motion for simplification of the issues.

On April 12, 1971, the trial court heard argument on the parties'

---

[2] See recent annotation *Modern Status of Rules As to Use of Motion In Limine or Similar Preliminary Motion to Secure Exclusion of Prejudicial Evidence or Reference to Prejudicial Matters*, 63 A.L.R.3d 311 (1975).

motions and rendered its decision granting the motion of the State and denying the motion of defendants.

On May 12, 1971, defendants filed a motion for reconsideration, together with a memorandum of law. On September 14, 1971, the parties by stipulation filed a supplementary statement of facts.

On November 15, 1971, after hearing oral argument, the trial court ruled:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the compensation for the property being taken shall be based upon a zoning classification of 'R-2' single-family residence district under the Village of Addison Zoning ordinances.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the attorneys shall instruct their witnesses that evidence of value will be admissible only if based upon a consideration of the property taken as zoned 'R-2' single-family residence district under the Village of Addison Zoning Ordinances."

The trial of the case began on October 10, 1972. At a preliminary meeting between counsel and the court, the court said that "the owners' testimony will be limited as to the part taken to use as a single-family residence." The court also noted that the defendants had a continuing objection on the basis of the court's prior ruling.

During the trial, all the appraisal witnesses adhered to the court's ruling regarding value. The defendants' first valuation witness was Richard W. Manke, a developer, broker and appraiser. Mr. Manke testified that the highest and best use of the subject premises before the taking was in accordance with its zoning—commercial uses along the Lake Street frontage going south to the William Bros. pipeline with the balance of the property being developed with multiple-family uses. Mr. Manke then gave his opinion of value considering these uses while being aware of the legal direction from the court. He said that the part taken had a fair cash market value of $105,000.

Rolf C. Campbell, a land planner, next testified for the defendants. He said that the highest and best use of the subject premises before the taking was a combination of a community shopping center on the north portion with apartments of a relatively high density on the south portion.

The defendants' next valuation witness was Don P. Neuses, an MAI appraiser. He stated that the highest and best use of the subject 70 acres before the taking was as zoned, "that is for a combination of commercial and multiple-family uses." In response to a question regarding his opinion of the value of the part taken, Mr. Neuses said:

"As you indicated, I have been instructed to value it as single-family residential and as such it is my opinion that the part taken is $112,000.00."

The defendants also offered evidence of two comparable sales. The first involved an 8-acre parcel, zoned multiple-family at 17 dwelling units per acre, located about 2 miles west of the subject property at Lake Street and Glen Ellyn Road. The sale took place in June 1969, 4 months prior to the taking, and the purchase price was $265,000 or $32,000 per acre.

The second (the K-Mart sale) involved an 11½-acre parcel, zoned commercial, located at Lombard and Lake Streets, approximately one-half mile east of the subject premises. The sale took place in September 1968, and purchase price was $300,000 or $26,000 per acre.

The State called two appraisers and one land planner to testify. Its first witness was Thompson Dyke, the planner for the Village of Addison, who testified that the highest and best use of the subject premises before the taking was a combination of commercial and multiple uses in accordance with the zoning. He also testified that the comprehensive plan for the village of Addison designated commercial and multiple-family uses for the subject premises.

The State's next witness was Edward Bundy, a broker and appraiser. He, too, testified that the highest and best use of the subject premises before the take was in accordance with its zoning for commercial and multiple-family uses. He went on to testify that the fair cash market value of the part taken—based upon single-family residential uses—was $98,000. He further testified that in valuing the whole subject premises, he considered the commercial areas to have a value of $27,000 per acre and the multiple-family areas to have a value of $25,500 per acre.

Mr. David Auble, an MAI appraiser, was the last witness called by the State. He said that the highest and best use of the subject premises was a combination of commercial and multiple-family uses, and that the value of the part taken, based upon single-family residential use was $104,000.

On October 17, 1972, the jury returned its verdict, upon which judgment was entered in part as follows:

"We, the Jury, find the just compensation to be paid the defendant for the taking of its property to be $105,000.00."

Subsequently, defendants filed their post-trial motion alleging as error the pretrial rulings of April 12, 1971, and November 15, 1971,

and a portion of the judgment entered November 1, 1972, which provided:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the sum of money hereby awarded by the jury to the owner or owners of and party or parties interested in said real estate described herein as Parcels, 10, 11 and 12 (consolidated) is just compensation to the owner or owners of and party or parties interested therein for the taking &ast; &ast; &ast; of said real estate and fee title and judgment is herein entered accordingly, as follows:

A–1. For the taking of Parcels 10, 11 and 12 (consolidated) One Hundred Five Thousand Dollars ($105,000.00)."

On December 15, 1972, the trial court denied defendants' post-trial motion.

The basic question on defendant's appeal is whether section 4 of the ordinance down-zoning the part taken should not have been given effect in order that the property should be valued at its highest and best use.

■■ Although in most situations a collateral attack upon zoning is not permitted in an eminent domain proceeding (see Annot., 9 A.L.R.3d 291, 303 (1966), and cases there cited), that principle is inapplicable to the situation where the condemnor purporting to exercise its police power by enacting a zoning ordinance has in reality discriminated against a particular parcel or parcels of land in order to depress their value with a view to future takings in eminent domain. (4 Nichols on Eminent Domain § 12.322 (3d ed.); Annot., 9 A.L.R.3d 291, 304 (1966), section 5[b] and cases there cited, 53 Ill.B.J.956, 973 (1965).) In such a situation such action has been vigorously condemned as confiscatory and the condemnee may attack the validity of the zoning ordinance in the eminent domain action and if successful require that his property be valued free of its restrictions. The courts have considered this situation extreme because it contains positive elements of confiscation and denial of basic constitutional rights.

Is it reasonable that a subdivider should be required under the guise of a police power regulation to dedicate a portion of the value of his property; or does this amount to a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations?

In almost all cases the zoning authority acted unilaterally in its attempt to depress the value. No cases cited involved an agreement to the lesser zoning by the owner.

The defendants have raised four issues contending that section 4 of

the ordinance is void:[3] The State in its brief has not come to grips with any of defendants' contentions and has failed to argue them at all, but contends: (A) The defendants are estopped from challenging the agreement; and (B) That a collateral attack may not be made on the ordinance.

The trial court in its pretrial order found that the defendants accepted benefits arising from the preannexation agreement in the form of zoning changes, subdivision of a portion of the property, issuance of building permits and sewer and water facilities and at no time objected to section 4 of the ordinance and that therefore their conduct constituted a ratification of section 4 and a waiver of any objection thereto and that they are prohibited from asserting the invalidity of section 4 by reason of equitable estoppel.

We will first dispose of the collateral attack argument and then return to estoppel. If an ordinance is void in the sense that the legislative body had no constitutional or statutory power to pass it, or it was never legally enacted it may be collaterally attacked. A void ordinance is subject to direct or collateral attack whenever its authority is invoked in a judicial proceeding. (8 Ill. L. & Pr. *Cities, Villages, and other Municipal Corporations* § 148 (1954); *City of Lincoln v. Harts,* 250 Ill. 273, 278.) The State in the instant case invoked the ordinance as a limitation on evidence as to value. The owners questioned the application of the downzoning as a limitation on evidence as to value. To a degree this is done every time a court permits evidence of market value based on the reasonable probability of a change in zoning within the foreseeable future.

*People ex rel. Seiler v. Calloway,* 344 Ill. 488, cited by the State, has no application to the facts of this case. The State also cited *Pioneer Trust & Savings Bank v. Village of Mount Prospect,* 22 Ill.2d 375, and *Ayers v. City Council* (1949), 34 Cal.2d 31, 207 P.2d 1.

■■ Illinois, by statute, has given municipal plan commissions broad subdivision recommendatory powers which include the power to establish "* * * reasonable requirements governing * * * public streets and highways, alleys, ways for public service facilities, curbs, gutters, sidewalks, street lights, parks, playgrounds, school grounds * * *." (Ill. Rev. Stat., ch. 24, par. 11—12—5(1).) In answering

---

[3] (a) The requirement was unreasonable and had no relation to the health, safety and welfare of the municipality.

(b) Arbitrary and capricious and a violation of due process.

(c) Denied constitutional right of just compensation for the taking of their property.

(d) The village failed to comply with the Statutes governing annexation and rezoning in that no public hearing was held prior to adoption of the ordinance.

the question who is to bear the cost of the new facilities—the municipality of the developer—it is recognized that it is proper to make the developer assume the burdens or costs which are specifically and uniquely attributable to the addition of the subdivision. This rule was accepted by Illinois in *Pioneer Trust & Savings Bank v. Village of Mount Prospect*, 22 Ill.2d 375, 380, which case followed *Ayers v. City Council of Los Angeles*. "If the requirement is within the statutory grant of power to the municipality and if the burden cast upon the subdivider is specifically and uniquely attributable to his activity, then the requirement is permissible; if not, it is forbidden and amounts to a confiscation of private property in contravention of the constitutional prohibitions rather than reasonable regulation under the police power." This is the "causation rule" or rule of "unique attribution" which harmonizes the distinction between eminent domain and police power regulation better than other allocation rules. As stated in Comment, *Allocating the Burden of Increased Community Costs Caused by New Developments*, 1967 U. Ill. L.F. 318, 325:

"When the state takes property to meet the needs of the general public, it should compensate the owner. When the state makes a person bear the costs of activities, only regulation occurs."

In the case of *Galt v. County of Cook*, 405 Ill. 396, a set back line was increased to 130 feet from the center line of the highway by the county zoning ordinance. One of the purposes was "in the interest of the public, so that when an improvement does come along as is planned in this case, the State or the county will not be obliged to pay excessively for removing improvements which are in the way of ultimate highway improvement." Our supreme court said, "the record makes it abundantly clear that the primary purpose of the special setback restriction was to hold down the cost * * * for the widening of North Avenue and that this was to be accomplished at the expense of a few individual landowners. In both purpose and extent the restriction involved bears no perceptible relation to the public health, safety, comfort and general welfare." (405 Ill. 396, 406.) It was held to be unconstitutional and void.

■■ Where the real purpose of the enactment was to depress or limit property values in order to minimize the costs of acquisition of such property in anticipated condemnation proceedings the courts have not been reluctant to declare such ordinances unconstitutional and void. Annot., 36 A.L.R. 3d 751, 763 (1971).

■■ Landowners may make a contract which may be recognized as a motive for rezoning but such zoning must meet the test of all valid zoning as above. The direct and sole purpose of subsection 4 of the ordinance involved herein was to devalue land to be acquired for a

public purpose. The public purpose sought to be advanced and the means taken to achieve it is in no way specifically and uniquely attributable to the activity of the owners. It is therefore forbidden and amounts to a confiscation of private property rather than reasonable regulation under the police power. The property owner must be protected from prejudicial evidence as to value based on restrictions on the use of his property unconstitutionally impressed as a design to depress its value.

This court in *Cederberg v. City of Rockford*, 8 Ill.App.3d 984, discussed "contract zoning," held the ordinance there in question void but remanded with directions to hear evidence and make a determination on the issue of equitable estoppel. In the instant case as in *Cederberg* there is no indication in the record that the downzoning was necessary, or that it was done only after a consideration of the appropriate use of land and consistent with the developing character of the neighborhood.

On the question of equitable estoppel the State has provided but three cases. In the case of *In re Rosedale Avenue, City of New York* (Sup. Ct. 1963), 40 Misc. 2d 1076, 243 N.Y.S. 2d 814, the owner had applied for a zoning change for a bowling alley and had knowingly waived any enhancement of damages by reason of the change if the land was taken by condemnation by the city for the street widening. At the time of the application for zoning change a proposed widening of the street by taking 30 feet on each side was approved and a public hearing had been held. The case involved a 30-foot strip of vacant land to be used for the street-widening purpose. The court, refused to allow the owner to avoid his agreement stating it would be considered a positive dereliction of duty for the city to enact legislation enhancing the value of land it would shortly acquire for public purposes without in some way requiring that the city's interests be protected and on basic equitable principles the owner could not avoid the burden of an agreement *which could have been relied upon by the City* in changing its position. (Emphasis supplied.) This case followed the case of *Church v. Town of Islip* (1960), 8 N.Y. 2d 254, 203 N.Y.S.2d 866, 168 N.E. 2d 680, which expounds the view that when a zoning authority does not make an agreement to zone but is motivated to zone by agreements as to the use of the land made by others or by voluntary restrictions running with the land although suggested by the authority, the zoning ordinance is valid and not considered to be contract or conditional zoning.

In *Woodside Homes, Inc. v. Morristown* (1958), 26 N.J. 529, 141 A.2d 8, a developer agreed to bear the cost of having the municipality extend its water mains to his development. After the work was done

he refused to pay the city and attempted to deny the validity of the agreement. The court held the developer estopped to deny the contract. The case did not involve zoning and has no application here.

In *Board of Education v. E. A. Herzog Construction Co.*, 29 Ill.App.2d 138, the developer voluntarily agreed to pay $95,000 toward the cost of a new school building as it realized that a new school building was essential to its sales program. After the school was built the builder attempted to renege on its voluntary agreement. The court did not permit it to do so. This was a case between the contracting parties.

Defendants in reply contend that the doctrine of estoppel is inapplicable to the facts of this case and that an essential element of estoppel in pais is that the party claiming the estoppel must have been misled to his injury by an intentional misrepresentation made to induce reliance by the party sought to be estopped.

Equitable estoppel contemplates a change in the position of one party induced by the statements or conduct of another, so that the person attempting to set up an equitable estoppel must have altered his position in such a way he would be injured if the other person is not held to the representation on which the estoppel is predicated. 18 Ill. L.&Pr. *Estoppel* § 23 (1956); *Ptaszek v. Konczal*, 7 Ill.2d 145, 153; *Malloy v. City of Chicago*, 369 Ill. 97.

■■ In the instant case it is the Department of Public Works claiming the estoppel. There is no evidence or indeed any basis upon which an assertion can be predicated, that the Department was misled by this ordinance provision, or by the conduct of the owners or that the owners effected such provision to induce reliance by the Department. There was no showing that the Department located its improvement in reliance upon the downzoning clause of the ordinance. The principles of estoppel have no application here. The Department was in no position to urge the doctrine of estoppel.

The judgment as to the just compensation for the part taken is reversed and the cause is remanded for a new trial as to the part taken.

## THE STATE'S CROSS-APPEAL

■■ The defendants had filed a cross-petition alleging damages to the remainder of the property not taken and introduced evidence of such damages. The State was thus entitled to show special benefits to the land not taken which could be set off against the damages to land "not taken" (but not against the value of the land "taken"). Special benefits are the benefits which flow from the proposed public improvement and which are not simply the advantages of progress accruing to the community at large, but which accrue to the particular land alone

or to only the immediate neighborhood. (*Brand v. Union Elevated R.R. Co.*, 258 Ill. 133;[4] Comment to IPI (Civil) 300.49.) The judgment in the instant case awarded defendants $148,000 for damages to the land not taken. The State has appealed.

The owners contended that the portion north of the high line was damaged to the extent that it was no longer suitable for commercial use. The State contended that the value was actually enhanced as a result of the taking and also that the property north of the high line was subject to a reasonable probability of being rezoned for commercial use.

In October, 1972, an agreement was entered into between the owners of the part not taken and the May Department Stores of St. Louis. By this agreement the owners gave May an option to purchase at $60,000 per acre the portion of the remainder north of the high line, subject to the condition that the portion of the property zoned multiple-family would be rezoned commercial (plus other conditions).

The trial court refused to allow cross-examination of one of the owners regarding this option, stating that it was too remote from the time of the taking. An offer of proof was made. The State contends but the agreement demonstrated that both May and the owners considered the land suitable for commercial use and that it could be rezoned to commercial use in contrast to the theory and expert testimony presented by the owners at trial to the effect that it was not suitable for commercial use.

■■ In general, offers of sale made by the owner, and other admissions as to the value of his property and the amount of his damages, are competent evidence against him, if sufficiently near the time of the taking to be of service to the jury, and if not made as part of an attempt to compromise. It is therefore clear that actual sales or executory contracts of sales made by the owner, or options given by him for the sale of the land in question at a particular price, are generally admissible against him in eminent domain proceedings or actions for damages by appropriation for public use, as admissions or declarations against interest. *Springer v. City of Chicago*, 135 Ill. 552, affirming 37 Ill.App. 206; 27 Am. Jur. 2d *Eminent Domain* § 423 (1966); Annot., 155 A.L.R. 262, 273 (1945).

■■ The general view indicated by the authorities is that a claimant in eminent domain who has testified in his own behalf as to the value

---

[4] The problem of which benefits are special or local, as opposed to public or general, is a subject with which we are not here concerned. See Annot. 145 A.L.R. 7 (1943); Comment to IPI (Civil) 300.50.

of the land in question may be interrogated, upon cross-examination, as to the price at which he has sold or contracted to sell such land, such cross-examination being allowed for the purpose of rebutting the claimant's testimony, or testing the credibility of his opinion evidence as to the land's value.

In *Springer* the action was for damages caused by an improvement which was completed by the city in July or August of 1888. During the month the improvement was completed plaintiff gave an option to one Hurlbut for the property for a certain time at a stipulated price. Hurlbut did not close the contract within the time specified in the offer. On trial the court permitted the defendant to prove the price placed on the property by plaintiff in his offer to Hurlbut. Our supreme court stated, "In order to determine whether the plaintiff had been damaged by the construction of the improvement, it was proper to show the value of the property before and after the improvement was made." 135 Ill. 552, 556-57.

A sale of property one year after the petition for condemnation was filed was held not admissible in evidence in *Pittsburg, Cincinnati, Chicago & St. Louis Ry. Co. v. Gage*, 286 Ill. 213, 222, but damages to the remainder were not involved in that case.

■■■ The measure of damages for property not taken is the difference in the fair market value of the property as a whole before and after the improvement and in making this computation, special benefits accruing to the remaining parcel by reason of the improvement must be set off against resulting damages. (*Cuneo v. City of Chicago*, 400 Ill. 545, 551; *Department of Public Works & Buildings v. Divit*, 25 Ill.2d 93; 17 Ill. L.&Pr. *Eminent Domain* § 64 (1956).)[5] The time of completion of the improvement is material. (*Cuneo*, 400 Ill. 545, 551.) We believe that remoteness should have been measured from the time of completion of the improvement rather than the time of filing the petition. Further, in *Metropolitan Sanitary District v. Industrial Land Development Corp.*, 121 Ill.App.2d 393, 400, the court rejected an argument that a new rule of law be promulgated prohibiting admission in evidence of a sale price 4 or 5 years remote. Five and one-half years was held not too remote in that case. The State should have been allowed to bring out the evidence on cross-examination of the owner.

The State asked for and was denied a new trial on the ground of

---

[5] New section 9.7 was added to the Illinois Eminent Domain Act effective July 1, 1972 (Ill. Rev. Stat., 1972 Supp., ch. 47, par. 9.7). It provides that in valuation of condemned property, any appreciation or depreciation caused by the improvement shall be excluded. (See 1973 U.Ill.L.F. 461-465.) Our supreme court has held that it applies prospectively. *City of Chicago v. Loitz*, 61 Ill.2d 92, 329 N.E.2d 208.

new evidence. At trial the owners proceeded on the theory that the property was not eminently suitable for business use. About a month after trial the owners and the May Company sought rezoning of the subject premises north of the highline from R-3 to B-3 with a special use. Whether or not such rezoning was ultimately allowed by the Village of Addison does not appear in the record.

■■ It has been held that in determining the benefit to the remainder that consideration can be given to the reasonable probability of a change in zoning. (*People ex rel. Department of Public Works v. Hurd* (1962), 205 Cal. App. 2d 16, 23 Cal. Rtpr. 67; Annot., 13 A.L.R. 3d 1149, 1207 (1967).) It is now well settled that the jury may consider the reasonable probability of a zoning change in determining the highest and best use of property. (*Department of Public Works and Buildings v. Rogers*, 39 Ill.2d 109; *Lombard Park District v. Chicago Title & Trust Co.*, 103 Ill.App.2d 1.) There is then no logical reason why such reasonable probability of a zoning change should not be considered in determining benefit to the remainder depending on whether there is sufficient evidence of factors[6] which would permit a jury to conclude that there is a reasonable probability of rezoning. Actual rezoning subsequently to the taking has been held admissible, (Annot., 9 A.L.R. 3d 291, 320 (§ 11) (1966)), especially if the intervening zoning change has resulted from the project.

For the above reasons we believe that the judgment for damages to the property not taken must be reversed and the cause remanded for a new trial.

Reversed and remanded.

RECHENMACHER, P. J., and T. MORAN, J., concur.

---

[6] See *Lombard*, 103 Ill.App.2d 1, 8, for some factors.