THE DEPARTMENT OF PUBLIC WORKS AND BUILDINGS, Petitioner-Appellee, *v.* EXCHANGE NATIONAL BANK OF CHICAGO *et al.*, Defendants-Appellants.

Second District (2nd Division)    No. 75-163

Opinion filed July 15, 1976.

Harold E. Collins, of Chicago, for appellants.

William J. Scott, Attorney General, of Chicago (Frank S. Righeimer, Jr., Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

The defendants appeal from an eminent domain judgment awarding them a total of $357,650 as just compensation following a jury verdict in Du Page County. They contend that various trial errors prevented a fair trial and that the proceedings should have been stayed and petitioner compelled to seek permission of the Illinois Commerce Commission for the taking of and damages to the property of Nordic Park Water and Sewage Disposal Co., Inc.

I

The proceedings were commenced by the State on October 20, 1969, to acquire certain parcels of land for the construction of Federal Aid Route No. 61. The Water Company was not made a named party (except as Unknown Owners) because a title search had not disclosed any interest of record in that company. It had unrecorded interests.

Nordic Investment Corporation, of which William F. Smeja was president, and William F. Smeja were made parties. Smeja was also president of the Water Company.

Pursuant to motion and after notice to Smeja and the Investment Company the court held a hearing under the quick take statute and on October 28, 1969, entered an order fixing preliminary compensation in the quick take proceedings.

On November 25, 1969, the Water Company entered an appearance and *filed* a cross-petition alleging that it was the owner of certain subsurfaces and easements in the properties condemned and claimed damages to the remainder. It further alleged that it was a public utility company subject to jurisdiction of the Illinois Commerce Commission and that the petitioner had failed to obtain the approval of the Commission for the taking of the property of the Water Company. It prayed that the court stay all proceedings (except withdrawal of

preliminary compensation in the quick take). The Water Company did not bring the matter to the attention of the trial court. On January 13, 1970, an order was entered finding that petitioner had deposited the funds provided for in the order of October 27, 1969, and vesting title in petitioner to the land involved.

A withdrawal petition was filed by all defendants including the Water Company and on January 28, 1970, orders were entered as to each parcel that the amounts found as preliminary compensation be paid out. No specific amount was awarded to the Water Company by this order.

The Water Company filed another petition on July 27, 1970, alleging that there were wells on the property obtained in the quick take which had not been capped and which were contaminating the water supply and asking that the wells be covered and damages be determined in the condemnation proceedings. The court later found that the wells had been capped.

In various pleadings the Water Company requested that its property be valued as a special use property. It, through a memorandum of law, stated "the cross petition filed by Nordic Park Water in this cause does not challenge the jurisdiction of the Court nor does it challenge the authority of the Department * * * to condemn the property in question." It asked for a stay. The request for stay was denied and all matters were consolidated for trial.

When the matter came before the jury the Water Company stipulated to the amount of its damages—$4,000.

Only a temporary easement which has since expired was acquired on the property leased by the Water Company.

A 1957 amendment to section 2 of the Eminent Domain Act (Ill. Rev. Stat., ch. 47, par. 2) added a concluding sentence as follows:

"No property belonging to a railroad or other public utility subject to the jurisdiction of the Illinois Commerce Commission may be taken or damaged, pursuant to the provisions of this chapter, without the prior approval of the Illinois Commerce Commission."

The quick take statute (Ill. Rev. Stat., ch. 47, par. 2.1) was added in 1957 and it has a similar requirement as follows:

"[N]o land or interests therein now or hereafter owned, leased, controlled or operated or used by, or necessary for the actual operation of * * * any other public utility subject to the jurisdiction of the Illinois Commerce Commission, shall be taken * * * without first securing the approval of such Commission."

Section 2.1 also requires a certified copy of the order of the Commission granting approval to be attached to the quick take petition.

■■ The requirement of prior approval of the Illinois Commerce Commission is a statutory condition which should exist. But, it is for a

court to decide, as a preliminary question, when called on, whether the statutory conditions authorizing the exercise of such power exists, and, if such statutory conditions are not found to exist in the specific case, to dismiss the petition for condemnation. *Bierbaum v. Smith*, 317 Ill. 147, 148.

■■ The Illinois eminent domain statute (ch. 47, par. 2) requires that all persons interested in the premises, as owners or otherwise, *appearing of record*, must be made parties defendant in a condemnation proceeding. This would appear to require the plaintiff in such suits to proceed only against persons who appear of record as owners or otherwise. Here the owners of record were named defendants. There is nothing to show notice sufficient to put the State on notice that the Water Company had any interest although the Water Company, by virtue of service on its president could hardly claim that it had no notice. (See *Illinois Power Co. v. Miller*, 11 Ill. App. 2d 296, 309.) At the time of the commencement of the proceedings and even at the time of the quick take the Water Company was not a necessary party to the proceeding. (*Illinois Power Co.*, at 309.) At the time of the filing of the petition for condemnation, the State had a perfected right of eminent domain and at the time of the quick take proceeding the State had a perfected right of quick take. Approval of the Commerce Commission was not then a condition precedent to the jurisdiction of the Court. The jurisdiction of the court had been properly invoked (*Central Illinois Electric & Gas Co. v. Scully*, 17 Ill. 2d 348, 352), as the petition to condemn and the quick take motion stated every fact the law required to be stated to give the court jurisdiction to hear and determine the proceedings.

At the hearing on quick take the trial court, pursuant to statute (ch. 47, par. 2.2(b)) determined that the petitioner had authority to condemn. This order is final and appealable as soon as it is entered and remains appealable for thirty days unless the court on good cause shown shall extend the time for taking such appeal. (*Department of Public Works & Buildings v. Dust*, 19 Ill. 2d 217, 220.) This provision as to finality and appealability is controlling. (*Dust*, at 222.) A motion to vacate does not suspend the order nor does a motion for a stay of proceedings suspend the order since section 2.2(b) is special in scope. *Dust*, at 222; Ill. Rev. Stat., ch. 110, par. 1.

■■ Not having appealed from the quick take order of October 28, 1969, the parties cannot on this appeal challenge further the finding of that order that the petitioner had authority to condemn.

## II

■■ One of defendant's valuation witnesses, Auble, had previously been employed by the State to appraise the subject property. This

previous employment was kept from the jury. Defendants claim error. This issue was first discussed in Illinois by this court in *Department of Business & Economic Development v. Schoppe*, 1 Ill. App. 3d, 313, 317 (1971); it was thoroughly discussed in *Department of Public Works & Buildings v. Guerine*, 19 Ill. App. 3d, 509, 512-14 (1974), and again in *Department of Public Works & Buildings v. Hall*, 30 Ill. App. 3d 831, 834-35 (1975). This evidence was properly excluded.

### III

On direct examination Auble testified, "I have not made what I would class as a complete appraisal of the property. I made a preliminary appraisal analysis."

Cross-examination of the witness, Auble was brief; he was asked if he had been retained to make a complete appraisal of the property. He replied, "No." He was asked to distinguish the difference between a "complete appraisal" and a "preliminary opinion of value." His answer was that a preliminary opinion of value is less in scope than a formal, written appraisal. It is a verbal opinion as to probable values that would be arrived at should a complete appraisal be sought.

On redirect examination the defense offered a two page single spaced typewritten letter addressed to petitioner's attorney and showing a "preliminary appraisal estimate" as of October 29, 1969, by Auble and with four handwritten pages of Auble's computations attached to the letter. The trial court refused the offer.

Defendants argue that the testimony of the witness Auble had been denigrated by the questions put on cross-examination so that the full extent of the work of Auble should in all fairness be given to the jury.

■■ On redirect examination a witness may be asked questions to bring out circumstances repelling unfavorable inferences raised on cross-examination. Counsel has the right to ask any questions which may be proper to draw forth an explanation of the sense and meaning of the expressions used by the witness on cross-examination, but other than a foundation to the offer of the written report no redirect examination of Auble was made. Nothing in the cross-examination of Auble opened the door to an inquiry as to his prior employment. Auble on direct had testified that he had only made a "preliminary appraisal analysis" and had not made what he regarded as a "complete appraisal." An explanation of what he meant by these terms was certainly not impeaching nor did it raise any unfavorable inferences not raised by the witness himself on direct examination.

The trial judge was correct in refusing to admit the written appraisal.

## IV

The subject properties are part of the Nordic Park Subdivision located in the northwest quadrant of the intersection of U.S. Route 20 and State Route 53 in an unincorporated section of Bloomingdale Township, Du Page County. Addison is south of the subject property. Itasca lies to the north and northeast. The Nordic Hills Country Club is immediately north and adjacent to the Subdivision. The Medinah Country Club is immediately west and adjacent to the subdivision.

In general the Subdivision is bounded by Lake Street (U.S. 20) on the south; Illinois Route 53 on the east, Nordic Road on the north and Swift Road on the west. The area is almost midway between the interchange of the Northwest Tollway and Route 53 (about 7 miles to the north) and the East-West Tollway and Route 53 (about 9 miles to the south).

The area surrounding the Subdivision was a growth area, the trends indicated a continued development of the area. At the immediate intersection there were three service stations, several small commercial enterprises, and a new K-Mart Discount Center located about ½-mile east of Route 53 on Lake Street. (See *Department of Public Works & Buildings v. Exchange National Bank*, 31 Ill. App. 3d 88, for condemnation of tract to the south of Route 20.) Ken-Roy Industrial Park Subdivision had begun preliminary work and it was general knowledge and information that the Randhurst-Addison Shopping Center would be constructed in the northwesterly quadrant of Swift Road and Lake Street across from the subject property. Nordic Hills Country Club had been sold and was under development as a complete residential commercial and recreational development. The Nordic Park Subdivision and the subject properties are served by the same sewerage and water facilities.

### Parcel 0014

Owned by Nordic Investment; is about 77,000 square feet in size. Part A is all of Lots 5, 6, 7, 8, 9 and 11 and parts of Lots 12, 13 and 14 in Block 15; Part B is part of Lot 3 and all of Lot 4. Each of these lots is about 50 x 200 feet. Zoned B-2 General Retail allowing a broad range of commercial uses and residential units if not located on the ground floor. Improved by a small frame building used as the subdivision office and by four apartment buildings located on part of the block not taken. Lot 11 fronted on Lake Street (200 feet) and Eagle Terrace (50 feet). Lots 12, 13 and 14 fronted on Eagle Terrace (50 feet each); the remainder fronted on Andrene Lane.

### Parcel 0015 and TE 15

Owned by Nordic Investment, about 4.899 acres (213,400 square feet) taken out of an area of 5.84 acres (254,390 square feet) *roughly*

described as part of vacated Block 16 and vacated Lloyd Avenue. Zoned B-2 except the north 100 feet is zoned R-3 Special Use which allows single-family dwellings up to apartments with a density of 14 units per acre. Fronts on Lake St., Andrene Lane and the part not taken fronts on Tee Lane.

No improvements on the part taken.

TE 15 was a temporary easement on 0.171 acres (7,449 square feet) lying in the northwest corner of vacated block 16 and vacated Lloyd Avenue. Nordic Investment also owned parcel 0016 which took the south 10 feet of Lots 4, 5, 6, 9, 10, 11 and 12 in Block 14 an area of 4,620 square feet, these lots fronted on Lake Street and Tee Lane to the rear; Lot 4 fronted on Lake and Eagle Terrace.

Zoned R-3.

### Parcel 0021 and EO21

Owned by William Smeja and wife Lucile, it lies immediately west of the Nordic Hills Subdivision with a frontage on Route 53. The part taken was about 4.9 acres (213,444 square feet) being all of Tract 16 and the south 405.94 feet of Tract 17 in the First Addition to the Hills of Itasca.

A permanent easement totaling .289 acres (12,589 square feet) along Route 53 was also taken.

The property had about 800 feet frontage on Route 53. Improved with two single-family residences. Zoned R-3 with a probability of rezoning to R-3 Special allowing single-family apartments at a density of 21 units per acre.

Nordic Park Subdivision with the exception of Blocks 14, 15 and 16 all of which fronted on Lake Street was being developed as a residential single-family community. Respondents offered the following recent sales of tracts in Nordic Park Subdivision zoned R-3 single family, fully improved with sewer and water.

| Buyer | | Price | |
|---|---|---|---|
| 1. Barth Builders L2 B4 | Nov. 4, 1968 | $ 7,900 | $1.01 per sq. ft. |
| 2. Barth Builders Lot 11 and part of 12 B5 | Mar. 14, 1968 | $ 7,900 | .78 per sq. ft. |
| 3. Barth Builders L 15 and part of 16 B5 | Apr. 25, 1968 | $ 7,900 | .95 per sq. ft. |
| 4. Barth Builders L8 and part of 9 B8 | Mar. 3, 1969 | $ 9,900 | .83 per sq. ft. |
| 5. M & V Builders 3/4 of Lot 16 and all of Lots 17 thru 24 in B5 | Apr. 25, 1968 | $55,800 | .80 per sq. ft. |
| 6. D & N Quoghata L9 B3 | Dec. 28, 1968 | $10,400 | .70 per sq. ft. |
| 7. P & V Prestinario, L8, 9, and E 2.43 feet Lot 10 Blk 1 | Aug. 20, 1969 | $13,100 | .71 per sq. ft. |

Objection was made that respondent's experts had indicated the highest and best use of the subject property was not for single family but for either apartment or commercial.

The trial judge denied the admissibility of the sales on the grounds that they were not comparable. 1. They were single-family sales and none of the experts said the highest and best use of the subject property was for that use. 2. The areas of the sales were much smaller. 3. The character of the Nordic Hills subdivision where the lots were sold is a much different sort of area than the subject property.

■■ The party offering the sales claimed to be comparable has the burden of proving, as a preliminary to the introduction of the prices involved in such sales, that they are similar both in character and locality to the land being condemned. (*City of Evanston v. Piotrovicz*, 20 Ill. 2d 512, 522; *City of Chicago v. Avenue State Bank*, 4 Ill. App. 3d 235; *Department of Public Works & Buildings v. Jensen*, 11 Ill. App. 3d 93.) In the instant case the offered comparables were in the same subdivision and some were as near as the adjoining block though most were separated by the length of at least one block. But mere proximity of the land is not the sole test of similarity. (*Forest Preserve District v. Yelk*, 115 Ill. App. 2d 78.) The character of the land involved in the condemnation proceedings and the circumstances of the particular case are of importance. *City of Chicago v. Harbecke*, 409 Ill. 425; *Illinois Building Authority v. Dembinsky*, 101 Ill. App. 2d 59.

Before evidence of sales of other real property will be admitted to establish the value of the property in issue it must appear that the lands sold were similar in locality, quality, character, and usefulness to the land in question, and that the sales reflect ordinary present value, in that they were freely made, without compulsion, under comparable conditions, reasonably near the time of valuation in issue. *City of Evanston v. Piotrovicz*, 20 Ill. 2d 512, *Department of Public Works v. Drobnik*, 14 Ill. 2d 28; *City of Chicago v. Harbecke*, 409 Ill. 425.

Accordingly it must be shown to the reasonable satisfaction of the trial court, as a preliminary that these requirements are met in all essential particulars. *Kankakee Park District v. Heidenreich*, 328 Ill. 198.

Since no general rules can be laid down as to the degree of similarity required to exist between the properties the reception of the evidence rests largely in the sound discretion of the trial judge. (*Piotrovicz.*) The discretion is not unlimited.

Attached to the Water Company's cross-petition as Exhibit A is a reproduction of a plat entitled

"NORDIC HILLS
A COMMUNITY WITH A COUNTRY CLUB ATMOSPHERE."
We are reproducing it here as it may illustrate the thinking of the trial judge in concluding that the property north of Tee Lane was the true one family residential subdivision, whereas Blocks 14, 15, 16 are a buffering area as is the parcel 021 along Route 53.

■■ The condemned properties were oriented to multifamily and commercial development on a heavily traveled highway while the proffered sales were developed as single-family residences on residential streets. Four apartment buildings had been built on the north part of

Block 15 (not taken). No witness, not even respondents', considered single-family residential as the highest and best use of the property taken. We believe the trial judge was correct in his determination that the character of the property taken was different and that he did not abuse his discretion in rejecting evidence concerning the sales price of the single-family residential parcels.

Respondents also offered to prove by Howard Selcke that he had in March 1969 purchased a parcel of commercially zoned property in Addison, Illinois, for $82,500. This property was vacant commercial, as were respondents' Parcels 0014 and 0015. It was served by a main street and a side street as were the subject parcels. Zoning was the same. Size was 175 feet on Addison Road x 200 feet on Lorrain Road. Both improved with sewer and water. Selcke's property was in the village limits. It was 2 miles east and ½-mile south of the subject property.

The trial court denied the admissibility of this sale on the grounds that the sizes were not comparable, that one was in an organized developed community on a corner between two improved streets.

Other characteristics being equal, or almost equal, size, standing alone, does not establish such dissimilarity as to render evidence of similar sales incompetent. *City of Chicago v. Harbecke*, 409 Ill. 425, 433.

■■ The fact that the location of land was within corporate limits does not alone destroy its similarity to land not within such limits. *Harbecke*, at 434.

■■ The condemned property herein was in not much more than a "paper" subdivision (see *Union Electric Power Co. v. Sauget*, 1 Ill. 2d 125, and *Sanitary District v. Baumbach*, 270 Ill. 128) in a yet to be developed area, for all practical purposes it was unsubdivided or acreage as compared to Selcke's property which was subdivided property in a developed area. Our Supreme Court has consistently held that property which has been subdivided into lots is not similar to unsubdivided or acre property. (*City of Chicago v. Pridmore*, 12 Ill. 2d 447, 450.) We find no error in the trial court's refusal to admit Selcke's testimony.

## V

Jay T. Fitts testified as an appraiser for the State. On cross-examination he was asked what he meant by certain physical limitations on the property. He replied, "It involves the sewer capacity for this kind of project, basically." (It then appeared that the witness in computing his values had discounted about 20% because he did not consider the sewer facilities to be adequate as of October 1969. In terms of dollars, he reduced his valuation of the whole of all the parcels from $617,500 to $494,000; a reduction of $123,500.)

The defendants objected to anything that may have occurred

subsequent to October 1969 and moved to strike any answer that was not responsive. The court allowed this motion.

Almost immediately thereafter the cross-examiner asked, "Is it your testimony that there has been a sewer permit denied even afterwards?"

■■■■ The situation here is that the attorney for defendants in cross-examining Fitts made the initial inquiry as to whether sewer permits were denied after the valuation date. After Fitts answered affirmatively and after he was allowed to explain his answer on redirect, the attorney, instead of moving to strike the testimony, extensively questioned Fitts on recross about the permit denials. Under the circumstances respondents are in no position to complain. Respondents not only opened the door but also cross-examined the witness fully on the point. Motions to strike certain responses were made but *no motion to strike out the valuation testimony of the witness was ever made.* Where testimony appears to be admissible and is admitted, and it subsequently appears that the testimony was inadmissible, a motion to strike should be made to exclude the improper evidence. By failing to move to strike or for an instruction to the jury to disregard the evidence respondents waived any right to predicate error on such testimony. *Bell v. Toluca Coal Co.*, 272 Ill. 576, 583.

## VI

In connection with one parcel (021) another State appraisal witness Sutte testified that although it was in October 1969 zoned residential, he was aware that the owner had applied for rezoning to multiple family and that he considered multiple family to be the highest and best use; that in the owner's application, and as a requirement to the rezoning, the owner had agreed to dedicate .701 acre for a street[1] and that he, Sutte, had figured the maximum density of 21 units per acre under multiple family with that .701 acre dedicated to street so that in figuring total density for multiple family for Parcel 21 he had used 4.928 x 21; rather than 5.629 x 21. He also testified that if he considered Parcel 21 as 5.629 acres it would make no difference in his total valuation.

Respondents did move to strike this portion of Sutte's testimony contending that he failed to appraise the whole property. The trial court refused to strike stating that it was a matter for the jury.

■■ The testimony of an opinion witness may be stricken *if based* upon improper elements of market value. (*City of Chicago v. Central National Bank*, 5 Ill. 2d 164, 175.) Here the witness Sutte gave an opinion of the fair, cash, market value predicated upon what he considered to be the highest and best use of the land, to-wit, apartments at the density of

---

[1] Lloyd Avenue had been vacated from Tee Avenue south to U.S. 20.

21 units per usable acre. In order to have such a density, the cost to the owner to have the property rezoned would be dedication of a street so the property would sell to the best advantage. The matter is analogous to the facts in *Forest Preserve District v. Wallace*, 299 Ill. 476, 478, where the witnesses in giving their valuations considered not only the adaptability of acreage for the purpose of subdivision into business and residential lots and the demand for lots but also took into consideration the amount it would cost the owner to improve and prepare the property so it would sell to the best advantage. We see no error in the refusal to strike the testimony of the witness.

The judgment of the trial court is affirmed.

Judgment affirmed.

T. J. MORAN, P. J., and RECHENMACHER, J., concur.