THE DEPARTMENT OF TRANSPORTATION *ex rel.* THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. AMOCO OIL COMPANY *et al.*, Defendants-Appellees.

Second District No. 2—87—0727

Opinion filed September 12; 1988.

Neil F. Hartigan, Attorney General, of Springfield, and Walsh, Case, Coale & Brown, of Chicago (Shawn W. Denney and Robert J. Ruiz, Solicitors General, and Richard A. Redmond, Robert S. Hirschhorn, and Jeffrey E. Schiller, of counsel), for appellant.

Edward T. Graham, of Wheaton, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

This appeal follows a jury verdict in favor of defendant, Amoco Oil Company (Amoco), in plaintiff's action to condemn a portion of Amoco's property abutting Illinois Route 83. The jury returned a verdict of $350,000. Plaintiff appeals after denial of its post-trial motion. Plaintiff argues that the circuit court erred by (1) denying enforcement of an agreement between the parties limiting the amount of compensation for Amoco's property; (2) admitting Amoco's valuation evidence of other sales without making a determination of their reliability and reasonableness; (3) permitting Amoco to introduce evidence of the legal interpretation of a zoning ordinance requiring connection to public utilities; and (4) excluding evidence of conduct by Amoco which constituted an admission as to the market value of the subject property. Plaintiff also argues that it was deprived of a fair trial by prejudicial comments made by Amoco's counsel during closing argument. We affirm.

On March 17, 1965, plaintiff, the Department of Transportation of the State of Illinois (Department), executed and published a document known as a freeway order designating Illinois Route 83 a freeway.

The Department amended the freeway order in 1969 so as to include a portion of Route 83 near 35th Street in Westmont, Illinois, bordering the property which is the subject of this action. The amended freeway order reflected the Department's intention to limit access to the freeway. At the time of the designation, the subject property was vacant and unimproved. Amoco purchased the subject property on July 20, 1970, and requested a permit from the Department to construct driveways from the subject property onto Route 83. On March 10, 1971, the Department issued Amoco a document captioned "Temporary Freeway Permit" (permit). A copy of the permit is contained in the record and bears a document number of R71—9629. The first page of that document identifies Amoco as the applicant, contains a blank space for provisos, and is signed by a representative of the Department. Also appearing on that page is the signature of William Ahlborn. Ahlborn's signature appears directly below text stating that the permit and its provisions are agreed to. Although Ahlborn's signature does not identify him as a representative of Amoco, the addresses listed for both Amoco and Ahlborn are identical. The remaining pages of the document contain a description of the intended construction and various conditions relating to that construction. The last page purports to authorize Amoco to construct two access driveways from the subject property onto Route 83. That page also contains a section subheaded "Freeway Clause," providing, in pertinent part:

> "The petitioner [Amoco] understands that the above described entrance culvert and drives are within the limits of the freeway established on this highway by an order issued March 17, 1965 by the Department of Public Works and Buildings acting under authority conferred by existing legislation. It is further understood that the petitioner [Amoco] shall not claim additional damages by virtue of existence of the entrances described herein. It is also understood that this permit is accepted with the full understanding that any improvements constructed on the property after March 17, 1965 shall not be construed as increasing the value of right of access or right of way at such time as these rights are acquired for purpose of developing the freeway."

Amoco subsequently constructed a gasoline service station and repair facility on the subject property with two driveways permitting ingress and egress onto Route 83. Amoco also constructed two driveways allowing ingress and egress from the subject property onto 35th Street. Thirty-fifth Street does not have access onto Route 83. The station

has been leased and operated by John Mantooth at all times pertinent to this action.

On March 10, 1986, the Department filed a complaint to condemn Amoco's access rights to Route 83 and subsequently moved for immediate vesting of those access rights. The circuit court assessed preliminary compensation for the condemnation at $164,400, and that amount was deposited with the Du Page County treasurer. On April 7, 1986, Amoco filed its cross-petition against the Department seeking damages. Thereafter, the trial court entered an order extinguishing Amoco's access rights to Route 83 and vesting control of that portion of Amoco's property with the Department. The Department closed Amoco's Route 83 access driveways and took possession in August 1986.

On November 26, 1986, the Department filed its motion for summary judgment seeking to enforce the freeway clause of the permit so as to limit the value of the access rights condemned to that which preexisted the permit. The circuit court denied the Department's motion after concluding that the freeway clause was unenforceable. In so ruling, the court stated that the Department's insistence on making Amoco's agreement to limit the value of its property a condition of the permit was an improper exercise of its powers as its motive was to depress the property's value and deprive Amoco of just compensation. The court entered an order in accordance with that ruling, and the case proceeded to trial.

Prior to trial, the parties filed a series of motions *in limine*. The Department moved to exclude evidence regarding the sale of certain service stations from Texaco Oil Company to Mobil Oil Company on the basis that those sales were not comparable since they were part of a bulk sale of 71 service stations. The Department also moved to bar testimony regarding the legal interpretation of a zoning ordinance requiring developments in the area of the subject property to be connected to public utilities. The court reserved its ruling on both motions before ultimately permitting the evidence to be introduced. Amoco moved to exclude testimony regarding an offer by Amoco to sell a nearby service station and an offer by Mantooth to purchase the subject property. Amoco also moved to exclude evidence of an injunction obtained by Mantooth, the lessee of the subject property, preventing Amoco's attempt to terminate his lease. The court granted both motions.

At trial, Mantooth testified that he leased the subject property from Amoco and operated the station since its construction in 1971. The station is equipped with three gasoline-pump islands and four ser-

vice bays. The station's business consists of the sale of gasoline and automotive accessories as well as towing and car repair. Prior to the condemnation, gasoline sales made up 70% to 75% of the station's business volume. Gasoline sales fell to 59% to 60% of the station's business volume after the condemnation. Mantooth stated that the decline in gasoline sales did not dramatically affect profits since the profit margin for gasoline sales was only 6% to 8%, while the profit margin for the sale of oil was 50%, and the profit margin for labor was 100%.

John Cullian, a condemnation acquisition services engineer for the Department, testified that the existing infrastructure on Route 83 was out of date, in need of repair, and required capacity expansion. The Department planned to improve Route 83 by enlarging it from four to six lanes. The improvements required taking the access rights along Route 83. Prior to the condemnation, only the southbound traffic on Route 83 had access to the station, as the northbound lanes were cut off by a median strip.

Other witnesses testified regarding the requirements and costs of connecting the subject property to the public sanitary and water system pursuant to a local ordinance. The subject property is currently served by a well for water and a septic field for sewage. Conflicting testimony was given on the question of whether the condemnation affected the property's use and whether such a change in use would require connection to the public utilities. Both parties introduced cost estimates for making such a connection.

In addition, each side presented two valuation experts. The Department's experts, Fred Tadrowski and James Curtis, testified that the highest and best use of the subject property both before and after the condemnation was as a service station. Tadrowski placed the value of the subject property before the condemnation at $310,000. Tadrowski opined that the fair cash market value of the subject property after the condemnation was $145,600 and concluded that the compensable damages were $164,400. Using the same before-and-after approach, Curtis placed the fair cash market value of the subject property prior to the condemnation at $355,000. Curtis stated that the subject property's value after the condemnation was $201,450 and concluded that the compensable damages were $153,550.

Arthur Sheridan and Timothy Sullivan testified on behalf of Amoco. Both Sheridan and Sullivan testified that the subject property's highest and best use prior to the condemnation was as a service station. Sheridan placed the fair cash market value of the property at that time at $540,000. Sheridan based his appraisal in part on four

sales, all of which were included in a bulk sale of stations from the Texaco Oil Company to the Mobil Oil Company. Sheridan testified that, after the condemnation, the highest and best use of the subject property would not be a service station but rather an extension of a nearby office complex. Sheridan placed the fair cash market value of the subject property after the condemnation at $65,000, resulting in compensable damages of $475,000. In addition, Sheridan stated that the subject property would have to be connected to the public utilities as a result of its change in use. Sullivan placed the fair cash market value of the subject property before the condemnation at $530,000. Like Sheridan, Sullivan stated that after the condemnation the subject property could not be operated as a service station because of the loss of access to Route 83 and opined that the property's best use after the condemnation would be as an addition to the nearby office complex. Sullivan placed the subject property's fair cash market value after the condemnation at $60,000, resulting in compensable damages of $470,000.

At the conclusion of the evidence, the circuit court reconsidered an earlier ruling which allowed the Department to proceed first at all stages of the case and permitted Amoco to argue first and last in closing arguments. During closing argument, the Department told the jury to consider Amoco's assertion that the subject property could not continue to be operated as a service station in light of the fact that Mantooth had continued to operate the property as a service station since the condemnation. In rebuttal, Amoco answered the Department's reference to the station's continued operation by stating that "you don't take a loyal Standard Oil dealer after 15 years and throw him out." The jury returned a verdict fixing compensation for the condemnation at $350,000. The Department appeals following the trial court's denial of its post-trial motion.

The Department first contends that the trial court erred when it held that the freeway clause of the permit was unenforceable. We disagree.

■ At the time the permit was issued, section 2—212 of the Illinois Highway Code defined "freeway" as a highway specifically designed for through traffic to which abutting land owners had no right or only a limited right of access. (Ill. Rev. Stat. 1967, ch. 121, par. 2—212.) The Department was authorized to designate any established highway as a freeway when the safety and convenience of highway traffic would be promoted and the public interest served by such a designation. (Ill. Rev. Stat. 1967, ch. 121, par. 8—101.) Property owners whose land abutted designated freeways were prohibited from ei-

ther constructing new means of access or extending existing means of access from their property to the freeway without obtaining written consent from the Department, and the Department was provided with "full authority to deny [its] consent *or to specify and enforce the terms and conditions under which new means of ingress or egress may be provided or existing means enlarged or extended.*" (Emphasis added.) (Ill. Rev. Stat. 1967, ch. 121, par. 8—102.) The Department's discretion in denying or granting permits was intended to promote the safety and convenience of highway traffic and eliminate the danger of accidents. (See *Department of Public Works & Buildings v. Farina* (1963), 29 Ill. 2d 474, 479-80.) However, notwithstanding the Department's authority to limit access to designated freeways, an abutting property owner's right of access is a valuable property right and may not be taken without just compensation. *Department of Public Works & Buildings v. Wolf* (1953), 414 Ill. 386, 389.

In the instant action, the Department *granted* Amoco a permit allowing it access to Route 83, but conditioned the grant of access on Amoco's understanding that any improvements placed on the property, including the access entrances, would not increase the value of the right of access when it was eventually terminated. Relying on *Department of Public Works & Buildings v. Wolf* (1953), 414 Ill. 386, and this court's decision in *Department of Public Works & Buildings v. Exchange National Bank* (1975), 31 Ill. App. 3d 88, the trial court held this condition unenforceable as an improper exercise of power, concluding that the condition was designed to depress the value of the property and deprive Amoco of just compensation.

In *Exchange National Bank*, the Village of Addison entered into an agreement with property owners in which the village agreed to annex their property and divide it into separate parcels, zoning one parcel single-family residence, the second general residence, and the third service-business. (31 Ill. App. 3d at 93.) In return, the property owners agreed to donate a portion of the property for public use, submit a preliminary plat for the single-family area, and pay the annexation fees. (31 Ill. App. 3d at 93.) The agreement was amended to allow the owners to make a cash contribution to the village in lieu of the land donation. (31 Ill. App. 3d at 93.) The village subsequently enacted an ordinance annexing and rezoning the property; *however, that ordinance also provided that in the event that it became necessary to reacquire any of the annexed property for right-of-way purposes, the zoning of the property acquired would revert to single-family residence status.* (31 Ill. App. 3d at 93.) Although this provision was not part of the original agreement between the property owners and the

village, the minutes of the board of trustees' meeting at which the annexation agreement was being considered indicated that one of the property owners *agreed to the condition* on a question propounded by the village president. (31 Ill. App. 3d at 93.) Following the property's annexation and rezoning, a portion of the property zoned for service-business was condemned for right-of-way purposes, and the property owners challenged attempts to limit their compensation to single-family residence value. (31 Ill. App. 3d at 94-95.) The issue before the court was whether that portion of the zoning ordinance down-zoning the condemned property was enforceable. (31 Ill. App. 3d at 98.) The court determined that the sole purpose of that section of the zoning ordinance was to devalue land which was to be acquired for a public purpose. (31 Ill. App. 3d at 100-01.) Relying on *Galt v. County of Cook* (1950), 405 Ill. 396, the court held that the ordinance in *Exchange National Bank* amounted to an improper confiscation of property rather than a reasonable regulation under the State's police power. (*Exchange National Bank*, 31 Ill. App. 3d at 100-01.) In *Galt*, our supreme court similarly held that a zoning ordinance motivated by reducing the cost of an anticipated condemnation was unconstitutional and void since it had no perceptible relation to public health, safety, and general welfare. *Galt*, 405 Ill. at 406.

■ The trial court in the case at bar apparently noted the similarity of motive behind the zoning ordinance in *Exchange National Bank* and the permit condition here. With regard to the substance and validity of the conditions, there is no appreciable difference between these cases. To the extent that the vessel for the condition in the instant case takes the form of a permit issued by a governmental agency rather than an ordinance is a distinction without a difference for purposes of determining the condition's validity. (*Cf. Nollan v. California Coastal Comm'n* (1987), 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141.) In *Nollan*, the Court held that a condition placed on a building permit requiring the property owner to allow a public easement across his property was invalid since the condition had nothing to do with the purpose of the regulation requiring the permit. (483 U.S. at 836-37, 97 L. Ed. 2d at 689, 107 S. Ct. at 3148.) In that case, an ocean-front development ban was imposed to protect the public's view of the ocean, and property owners seeking to build on their ocean-front property were required to obtain a permit to do so. (483 U.S. at 828, 97 L. Ed. 2d at 683, 107 S. Ct. at 3143.) Not unlike the Department's authority in the instant action, the commission in *Nollan* was authorized to either deny the permit applications or grant them with conditions. (483 U.S. at 834-35, 97 L. Ed. 2d at 688, 107 S.

Ct. at 3147.) However, the Court noted that the validity of the conditions imposed would rise or fall depending on their relationship to the purpose of the building restriction. (483 U.S. at 836-37, 97 L. Ed. 2d at 689, 107 S. Ct. at 3148.) In concluding that the condition placed on the building permit in *Nollan* was not related to the development ban, the Court nonetheless opined that height restrictions or fence bans might have been proper. 483 U.S. at 836, 97 L. Ed. 2d at 689, 107 S. Ct. at 3147.

In the case at bar, the statute allowing the Department to prohibit abutting property owners from constructing access driveways to a freeway was intended to promote the safety and convenience of highway traffic and eliminate the danger of accidents. (*Department of Public Works & Buildings v. Farina* (1963), 29 Ill. 2d 474, 479-80.) Such a purpose might be served by conditions proscribing surfacing, dimensions, and illumination; however, it is clearly not served by a condition on a permit *granting* access which solely seeks to depress the property value in anticipation of future acquisition. (*Cf. Nollan*, 483 U.S. at 836-37, 97 L. Ed. 2d at 689, 107 S. Ct. at 3147-48.) Thus, the condition is improper and should not be enforced. See *Galt*, 405 Ill. at 406; *Exchange National Bank*, 31 Ill. App. 3d at 100-01; see also *Nollan*, 483 U.S. at 837, 97 L. Ed. 2d at 689, 107 S. Ct. at 3148.

■ The Department nonetheless contends that Amoco's agreement to the condition *by accepting the permit* should bar them from raising its validity in this action. We are constrained to disagree. Amoco's agreement to the condition has no bearing on this case. (See *Exchange National Bank*, 31 Ill. App. 3d at 93.) We note that just as Amoco in the instant action *agreed* to the permit condition by accepting the permit without challenge, the property owners in *Exchange National Bank* similarly agreed to the property value depressing condition in the ordinance. (31 Ill. App. 3d at 93.) Moreover, we are reluctant to consider Amoco's acceptance of the permit to constitute a waiver of its constitutional right to just compensation. As stated above, the Department's discretion to deny or conditionally grant access permits is intended to promote safe through traffic and eliminate accidents. (See Ill. Rev. Stat. 1967, ch. 121, par. 8—101; see also *Farina*, 29 Ill. 2d at 479-80.) A permit condition which depresses property value has nothing to do with public safety. If we were to hold that a property owner could waive his right to just compensation as a means of obtaining an access permit, the Department might use that condition to allow access where it otherwise would not under the guidelines of the statute. Thus, notwithstanding the inequities of Amoco's conduct, the fact that it accepted the permit is of no conse-

quence. Where an agreement, such as the one here, is found to be void and unenforceable, it is appropriate to leave the parties in the position in which they are found. (*Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 532.) In this case, that would require the Department to litigate the "just compensation" of Amoco's property as improved, which was precisely the action taken by the trial court. We have reviewed the Department's additional contentions concerning this issue and find them without merit. Accordingly, the trial court's decision denying the Department's motion for summary judgment was proper.

The Department next contends that the trial court erred by refusing to determine the relevance and reliability of "comparable" sales evidence before permitting its introduction to the jury. Specifically, the Department argues that the trial court's failure to hold an evidentiary hearing and bar Amoco's experts from referring to certain sales as a basis for their appraisals was error. We disagree.

■ In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 194-95, our supreme court adopted Rules 703 and 705 of the Federal Rules of Evidence (Fed. R. Evid. 703, 705) permitting experts to use facts or data otherwise inadmissible to form and explain the bases for their opinions if experts in their field reasonably rely on such information. This court has applied the *Wilson* holding to the testimony of valuation witnesses in eminent domain proceedings. (*Department of Transportation v. Beeson* (1985), 137 Ill. App. 3d 908, 910.) In *Beeson*, we rejected the plaintiff's argument that Rule 703 was inapplicable to the testimony of valuation witnesses since no uniform standard existed which was of a type reasonably relied upon by experts in the field. (137 Ill. App. 3d at 911.) We stated:

> "The rule only requires that the facts or data be of a type reasonably relied upon. It is common knowledge that valuation witnesses routinely consider different comparable sales when determining the value of a particular piece of property. There is no requirement in the rule that a uniform standard exists. The ultimate decision of comparability rests with the trier of fact. Although more responsibility will be placed on a jury if more evidence is admitted than traditionally, a juror should be able to synthesize the information he or she received in order to understand the differences between the proffered sales and the subject property." (137 Ill. App. 3d at 911.)

Thus, we concluded that Rules 703 and 705 should be applied to the valuation testimony of comparable sales with the result being that all sales reasonably relied upon by experts in the field are admissible. 137 Ill. App. 3d at 911-12.

At the hearing on the Department's motion *in limine* in the instant case, the trial court clearly stated that it was following *Beeson, Wilson,* and Rule 703 of the Federal Rules of Evidence. The court determined the issue to be one of credibility for the trier of fact, stating:

"So if the expert gets up here and says I am an expert and as a matter of law I the Judge say, yes, you are an expert and that the material you are relying upon is reasonably relied upon by other experts in your same field, then off we go.

And I tell the ladies and gentlemen of the jury, I say, ladies and gentlemen, the information now coming is not to be considered by you other than as a basis upon which this gentlemen is rendering his opinion and limited only for that purpose. And so then if he wants to talk about alleged comparables, he says they are comparables. Well, there it is."

■■ The court subsequently permitted Amoco's appraisers to testify using the controverted sales evidence as a basis for their appraisals. The court's decision was in accordance with *Wilson* and *Beeson.* (See *Wilson,* 84 Ill. 2d at 194-95; *Beeson,* 137 Ill. App. 3d at 910.) We reject the Department's argument that the trial court was required to hold a hearing to make an independent determination of whether the facts and data relied upon were information "reasonably relied" upon by experts in the field. While we do not take issue with the argument that a trial court *may* hold a separate hearing to first determine whether the expert's opinion utilizes material reasonably relied upon by experts in the field, we can find no authority for the Department's assertion that such a hearing is *required.* In any event, we find the trial court's comments at the hearing on the motion *in limine* coupled with its subsequently allowing Amoco's appraisers to testify using the controverted evidence sufficient to indicate that the court did determine that the sales evidence was of the type reasonably relied upon by experts in the field. Therefore, we conclude that the trial court did not err in allowing Amoco's experts to testify using the bulk sale as a basis for their appraisals.

■■ The Department next contends that the trial court erred in allowing Amoco to solicit interpretations on the effect the condemnation would have on the property under a Westmont zoning ordinance requiring improvements to connect to utility services. We disagree.

We note that it was *the Department* that brought the motion *in limine* to exclude evidence on the effect the zoning ordinance would have on the subject property as a result of the condemnation. Curiously, it was *the Department* that first solicited testimony regarding

the ordinance. In its examination of Tadrowski, the Department solicited and obtained Tadrowski's opinion on whether the condemnation resulted in a change in use of the subject property and whether the subject property would have to connect to utility services as a result of any change in use under the zoning ordinance. When Amoco solicited the same interpretations from its own witnesses the Department objected on the basis that interpretation of the ordinance was improper. The court overruled the Department's objections and repeatedly instructed the jury that the testimony was limited to show the bases upon which the witnesses were rendering their opinions of value. These limiting instructions coupled with the Department's initiation of this line of inquiry indicate that the Department was not prejudiced by this testimony. The Department states that it was forced to initiate this line of inquiry as a result of the circuit court "expressly" ruling "that interpretation testimony was allowed." The pages of the record cited in support of this assertion and our own review of the record simply do not support this contention. Therefore, we conclude that the trial court did not err in allowing testimony regarding the effect the condemnation would have on the property under the zoning ordinance.

The Department next contends that the trial court erred in precluding the Department from introducing evidence of an offer by Mantooth to purchase the subject property from Amoco and from further introducing evidence of Amoco's offer to sell a nearby station to its dealer at that location. The Department argues that these offers constitute evidence of the fair cash market value of the subject property after the condemnation and should have been introduced. We disagree.

■ Evidence of *bona fide* offers to purchase the subject property or property similar to the subject property may be relevant and admissible to show the value of the subject property. (*Department of Public Works & Buildings v. Lambert* (1952), 411 Ill. 183, 191; *Department of Transportation v. Bryant* (1978), 63 Ill. App. 3d 483, 486.) However, because offers to purchase are not completed transactions, their relevance depends on a close scrutiny of the underlying and surrounding circumstances. (*Bryant*, 63 Ill. App. 3d at 486.) Where the offer to purchase is made by a party to whom the property has unique or special value, the prospective buyer is unlike all other prospective buyers. (See 63 Ill. App. 3d at 486.) In *Bryant*, an offer to purchase property made by the adjoining landowner in connection with his business was found to be irrelevant to indicate the true market value of the property since the subject property had a special

value to the offerer. (63 Ill. App. 3d at 486.) The *bona fide* character of offers to purchase is a preliminary question which must be decided by the court, and the court's decision will not be disturbed unless it is against the manifest weight of the evidence. *Lambert*, 411 Ill. at 191.

■■ In the instant action, the trial court noted that evidence of *actual* sales was available and expressly rejected the Department's argument that the evidence of offers was admissible under *Department of Transportation v. Beeson* (1985), 137 Ill. App. 3d 908. The court noted that the offer to purchase the subject property was made by the long-time lessee of that property. The trial court also noted that Amoco's offer to sell another parcel similar in character and location was made to its lessee at that station. The court determined that the special relationship of the prospective purchasers to Amoco "may cause them to make an offer greater than the actual value of the property because they don't want to move and maybe they have good will built up in the business, *** or in the alternative, that it might be less than true value, because they have some type of leverage on the Amoco that would prevent Amoco from—let's say—getting them out under a long term lease or something of that nature." Thus, because of the special relationship between Amoco and the prospective purchasers in both offers, the court determined that the offers were not *bona fide* and therefore not relevant as evidence of the fair cash market value of the property. We cannot say that this determination was against the manifest weight of the evidence. Accordingly, the trial court did not err in prohibiting Amoco from introducing this evidence.

■■ Finally, the Department contends that it was denied a fair trial by statements made in Amoco's closing argument. Specifically, the Department argues that Amoco's statement that "you don't take a loyal Standard Oil dealer after 15 years and throw him out" was prejudicial since Amoco had prevailed in its motion *in limine* to prevent the Department from introducing evidence indicating that Amoco attempted to do that very thing. We note that the Department failed to object to Amoco's comment in closing argument. Where a party fails to state a timely objection to the remarks of counsel during his closing argument, any allegation of error resulting from those remarks is waived on review. (*Cahill v. Boury* (1986), 144 Ill. App. 3d 413, 415.) However, our supreme court has stated that if a prejudicial argument is made without the objection of counsel or interference of the trial court to the extent that the party is deprived of a fair trial and the judicial process cannot stand without deterioration, a reviewing court may consider the assignments of error even though an objection has not been made in the court below. (*City of Quincy v. V. E.*

*Best Plumbing & Heating Supply Co.* (1959), 17 Ill. 2d 570, 577.) Accordingly, we elect to review the comments of Amoco's counsel during final argument to determine if those remarks were so prejudicial that they denied the Department a fair trial. We conclude that they were not.

The record indicates that after its access rights were taken, Amoco sought to terminate its lease agreement with Mantooth. Mantooth challenged Amoco's attempt to terminate the lease in Federal court. Pursuant to a settlement between the parties, Mantooth agreed to dismiss his action in return for Amoco's agreement allowing Mantooth to lease the property on a month-to-month basis and receive gasoline products from Amoco during the pendency of the instant action. The court granted Amoco's motion *in limine*, thereby precluding the Department from introducing evidence of the Federal litigation or the agreement between the parties. Consequently, the jury was not informed of Amoco's attempt to terminate Mantooth's lease.

However, in the rebuttal portion of its closing argument, Amoco made the following statements:

"Mr. Flannery [the Department's counsel] mentioned something about the fact that it's still a service station. And it's still open, and indeed he is correct. And you saw that, and the sign is there. And he [*sic*] selling petroleum products to the extent that he can do enough garage work in the back to survive. He has been there since 1971, and I would submit to you *that you do not take a loyal Standard Oil dealer after 15 years and throw him out. You keep the premises open.*

It probably would have been more impressive insofar as a trial for the Defendant would have been concerned to have thrown him out and boarded it up. And then when you good people went to look at it, you could have seen what the actual consequences of this taking are ultimately going to be.

*But that wasn't the case. He is still there, and I submit to you that he is there because he has been a loyal dealer for 15 years, and no one is going to throw him out on his ear just because the State came along and took the access.*" (Emphasis added.)

The question of the property's highest and best use after the termination of access rights was an issue in this case directly related to compensation. The Department contended that the property's highest and best use was as a service station and in support of that position directed the jury's attention to Mantooth's continued operation of the station. Amoco attempted to rebut that argument by arguing that the

continued operation was due to Mantooth being a loyal dealer. The record is devoid of evidence supporting Amoco's argument that dealer loyalty was the reason for the station's continued existence. Indeed, had the substance of the Federal litigation been introduced, the jury could reasonably have inferred that dealer loyalty in fact had no bearing on Amoco's decision to enter into an interim lease with Mantooth. Because Amoco's argument is not supported by the evidence, it was clearly improper. See *Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 932-33.

However, our conclusion that Amoco's argument was improper does not end the inquiry. Generally, counsel's improper comments do not constitute reversible error unless the other party has been *substantially prejudiced* by those comments. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 454; *Burke v. Toledo, Peoria & Western R.R. Co.* (1986), 148 Ill. App. 3d 208, 214.) A prejudicial error is one which *affects* or *presumptively affects* the final result of the trial. (Black's Law Dictionary 1062 (5th ed. 1979).) If the trial was fair as a whole and the evidence is sufficient to support the jury's verdict, the trial court's judgment should not be reversed on review. (*Bresland*, 150 Ill. App. 3d at 454.) This would seem to be particularly so where no objection to the "error" was made at trial. In such cases, the error must cause a *"serious* deterioration of the judicial process." (Emphasis in original.) *Halka v. Zupan* (1979), 68 Ill. App. 3d 616, 619.

In the instant action, the assigned error does not rise to the level of causing a serious deterioration of the judicial process. After reviewing the entire record, we are of the opinion that Amoco's comment regarding dealer loyalty did not affect the result in this case to prejudice the Department. To the extent that the comment had any impact at all, it would appear to *support the Department's argument* that the highest and best use of the property continued to be as a service station. In contrast, evidence or argument that the lease had been terminated would appear to support Amoco's assertion that the property could not continue to be used as a service station.

In any event, the trial record in its entirety and the jury verdict do not indicate that the jury was prejudiced by Amoco's argument. Amoco's appraisers stated compensable damages at approximately $470,000 to $475,000, while the Department's appraisers stated compensable damages at approximately $153,550 to $164,000. The jury's award was $350,000, roughly splitting the damages stated by all the appraisers. Thus, it does not appear that the jury was prejudiced by Amoco's argument or that the verdict was affected by it.

Accordingly, after examining the concept of prejudice, we hold that while Amoco's argument was improper, it was not so prejudicial as to have denied the Department a fair trial.

For the reasons set forth above, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

DUNN and WOODWARD, JJ., concur.