THE DEPARTMENT OF CONSERVATION, Plaintiff-Appellee, v. STEVE DORNER *et al.,* Defendants-Appellants.

First District (1st Division)   No. 1—88—2726

Opinion filed December 18, 1989.

334

James R. Platt and William M. Doty, Jr., both of Chicago, for appellants.

Neil F. Hartigan, Attorney General, of Springfield, and Earl L. Neal & Associates, of Chicago (Earl L. Neal and Terrance Lee Diamond, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

The Illinois Department of Conservation (IDOC) instituted an action in 1982 to exercise its right of eminent domain over 13 subdivided lots owned by the defendants, Edward and Ann Twarog, Steven and Dorothy Dorner, and Wanda Miles (referred to collectively as the owners). After a trial to determine the value of the lots, a jury returned a verdict establishing the value at $5,450 per lot, a value within the range of values testified to during the trial. The owners appeal, arguing that the trial court improperly ruled on several motions *in limine*. For the reasons below, we affirm.

Wolf Road Prairie is an 80-acre subdivision located in Westchester, Illinois, bounded by 26th Street to the north, 31st Street to the south, Wolf Road to the east, and Forest Road to the west. Wolf Road Prairie is traversed by the middle and south forks of Salt Creek. Improved subdivisions lie to the east and west of Wolf Road Prairie, to the south lies forest preserve, and to the north, undeveloped land. In 1925, Wolf Road Prairie was subdivided into 597 lots of 3,087.5 and 4,075.5 square feet, zoned R-1 for single-family residence. Wolf Road Prairie has not been improved or developed: there are no streets, curbs, or sidewalks, no water, sewer, storm drainage, power, or utilities.

Thirteen lots, five owned by the Twarogs, five owned by the Dorners, and three owned by Miles (the subject lots) lie in the floodway of Salt Creek's south fork. Construction in a floodway is prohibited by regulations of the Illinois Department of Transportation, Division of Water Resources. Seven of the thirteen lots have been targeted as "Protected Wetlands" under section 404 of the Clean Harbors Act (33 U.S.C. 1344 (1982)). Designation as wetlands necessitates a permit from the Army Corps of Engineers before any construction on the property.

In 1976, owners of property in Wolf Road Prairie, including Steven Dorner, filed a *mandamus* action, unrelated to the instant case, to compel the Village of Westchester to install streets, sidewalks, sewers, water, and other utilities necessary to development in Wolf Road Prairie. The suit was unsuccessful and subsequently was dismissed voluntarily by the property owners in March 1986. See *Thomas v. Village of Westchester* (1985), 132 Ill. App. 3d 190, 477 N.E.2d 49.

Between 1976 and 1982, a conservation group called Save the Prairie purchased at least 40 Wolf Road Prairie lots for prices between $3,350 and $4,000. In 1979, Curtis Calvert, an attorney who later testified at trial, represented his father in the sale of 47 Wolf Road Prairie lots for $3,500 each. Seventeen of the Calvert lots were sold to owners Dorner and Twarog. The sales to Save the Prairie and from Calvert shall be referred to collectively as "the Wolf Road Prairie sales."

In 1982, IDOC filed the instant action for eminent domain, to use Wolf Road Prairie for flood control. Several defendants were dismissed, and now only the owners of the 13 subject lots remain. A jury trial was held to determine the value of those lots. Prior to trial, the trial court ruled on three motions *in limine*.

The owners moved to exclude the Wolf Road Prairie sales, contending that the *mandamus* action had "tainted" the sales, making them involuntary, and therefore, not comparable to determine the fair market value of the subject lots. The motion was denied.

IDOC moved to exclude as not comparable recent sales of improved lots from the adjacent Woodland View and Mayfair subdivisions. The Woodland View and Mayfair lots were buildable, improved lots, twice the size of the Wolf Road Prairie lots, and had recently sold for $35,000 each. IDOC also moved to preclude the owners' experts from basing opinions on the value of the subject lots on a "cost less development" formula, which determined the value of the property by subtracting improvement and development costs from

$35,000, a price derived from the Woodland View and Mayfair sales. IDOC contended that use of the formula would allow the property owners to introduce evidence of the Woodland View and Mayfair sales, even though the property owners' experts had admitted in depositions that those sales were not comparable to the subject lots.

The trial court ruled to exclude evidence of the Woodland View and Mayfair sales, but that at the proper time, the evidence would be heard without the jury, and the ruling would then be reconsidered. At trial, the court excluded the evidence. The trial court further ruled that the parties could not use the cost less development formula to establish the value of any lots outside Wolf Road Prairie, but that such sales could be testified to in accordance with applicable rules of evidence.

Trial commenced on May 13, 1988. IDOC witnesses testified to the Save the Prairie and Calvert sales. Thompson Dyke, a land use consultant, testified that development of Wolf Road Prairie was infeasible, and that the highest and best use of the subject lots was as open space because the subject lots were either in or affected by the Salt Creek floodway. Joseph Zgonina, a civil traffic engineer, testified that the subject lots could not be developed because Federal regulations prohibited construction in a floodway unless there was compensatory storage, *i.e.*, a temporary holding area for flood waters. Zgonina further testified that development was infeasible due to the prohibitive cost of installing utilities, and that even if Wolf Road Prairie were developed as a single property, the subject lots would remain open because they were in a designated floodway.

James Curtis, a real estate appraiser called as an expert, testified, relying in part on the Wolf Road Prairie sales, that 10 of the subject lots were worth $4,950, while the three lots owned by Miles, which were a little larger, were worth $5,040. Curtis also testified on cross-examination that the highest and best use of the land was assemblage of the single lots and development as multifamily residences. Curtis testified that assemblage was likely due to increased property values in the area, but that in his experience, assemblage was difficult and took a long time. At the close of IDOC's case, the trial court denied the owners' motion for a directed verdict.

The owners' first witness was Thomas Slowinski of the Army Corps of Engineers, who testified that the subject lots were located in a "Protected Wetland," and that a permit for construction would have been required as early as 1977. The owners, Wanda Miles, Edward Twarog, and Steven Dorner, testified to their purchase of the subject lots prior to 1976. Ralph Lindley, an engineer, testified to an existing

flood-diversion plan that would allow construction in Wolf Road Prairie, but at an estimated cost of nearly $4 million. Lindley also testified that the plan required assemblage. John Enright, a real estate appraiser, testified that the fair market value of the subject lots was $24,750, but did not specify any comparable sales relied upon or considered in arriving at the value.

James Paul, a real estate developer called as an expert, testified that the highest and best use of Wolf Road Prairie would be multifamily residential, and that the value for five of the subject lots was $24,750 each. In a sidebar, the trial court ruled that Paul could not testify to the sale of 10 improved lots from the Woodland View and Mayfair subdivisions, upon which he had based his opinion of the value of the subject lots.

The jury returned a verdict which valued the 13 lots at $5,040 each. The owners' post-trial motion was denied, and they appeal.

The owners raise four arguments. The first argument challenges admission of the Wolf Road Prairie sales as independent evidence of the subject lots' value, asserting that the sales were not comparable. The second and third arguments raise the same issue: the extent to which a valuation expert may testify to data and information that form the basis for his opinion, where that data and information are otherwise inadmissible. The fourth argument challenges the trial court's denial of the owners' motion for directed verdict. Each argument is without merit.

■ The owners first argue that the trial court erred in admitting the Wolf Road Prairie sales as evidence of the value of the subject lots. The value of condemned property may be established with evidence of sales of comparable property (comparable sales). Sales are comparable if the land was physically similar to the condemned property and the sales were made at about the same time as the condemnation. (*City of Chicago v. Blanton* (1958), 15 Ill. 2d 198, 202, 154 N.E.2d 242.) Other condemnation sales are not admissible as comparable sales because they are involuntary and often a seller has settled on a price below market value to avoid litigation costs. See *Oak Brook Park District v. Oak Brook Development Co.* (1988), 170 Ill. App. 3d 221, 524 N.E.2d 213, *appeal denied* (1988), 122 Ill. 2d 579.

Here, the owners contend that the Wolf Road Prairie sales were not comparable sales. Extrapolating from the principle that condemnation sales generally are inadmissible, the owners assert that *any* litigation impacting on the condemned land should be inadmissible. The owners contend that the Wolf Road Prairie sales were "tainted" by the pending *mandamus* action, which limited the uses for the prop-

erty, affecting its value and compelling the sales. Thus, say the owners, the Wolf Road Prairie sales were involuntary and should not have been admitted as comparable sales.

■ But the Wolf Road Prairie sales met the criteria for comparable sales. The land was physically identical to the subject lots. Further, the record shows that the sales were made within six years of the instant condemnation action, were negotiated between willing buyers and willing sellers, and made for approximately the same price. The *mandamus* action might have been a factor affecting the price of the lots, but there was no compulsion. In a condemnation action, the sale is forced: ownership of the property transfers to the State by decree or execution (*City of Chicago v. Vaccarro* (1951), 408 Ill. 587, 600, 97 N.E.2d 766), something more than economic expedience. Because the Wolf Road Prairie sales were comparable, they were properly admitted as evidence of the value of the subject lots.

The owners next challenge James Curtis' testimony on the Wolf Road Prairie sales, which he relied on to form his opinion of the value of the subject lots. The owners argue that Curtis' testimony should have been stricken because the sales were not comparable. The owners' argument, although without merit, raises an unsettled question concerning the extent to which a valuation expert may testify to the basis for his opinion, where it was based on otherwise inadmissible data or information.

*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, adopted Federal Rules of Evidence 703 and 705 in Illinois, and *Department of Transportation v. Beeson* (1985), 137 Ill. App. 3d 908, 485 N.E.2d 511, held that valuation witnesses were experts whose testimony was subject to Rules 703 and 705. Rule 703 provides:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (28 U.S.C. R. 703 (1982).)

Rule 705 provides:

> "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." (28 U.S.C. R. 705 (1982).)

Under Rules 703 and 705, a valuation expert could base his opinion on

data and information that are otherwise inadmissible, such as noncomparable sales. But the extent to which the expert could testify concerning the noncomparable sales remained unclear.

The established rule stated that where an expert relied on noncomparable sales to form an opinion, he could testify to the sales in general terms, but could not testify to the sale price. (*Lake County Forest Preserve District v. Bank & Trust Co.* (1982), 106 Ill. App. 3d 856, 436 N.E.2d 237, *appeal denied* (1982), 91 Ill. 2d 570.) The sales were admissible because they were not offered to assert their truth, but the court had the discretion to exclude prejudicial or confusing evidence. See *People v. Anderson* (1986), 113 Ill. 2d 1, 12, 495 N.E.2d 485.

■ *Beeson* apparently allowed the expert to testify specifically to all sales relied upon as a basis for his opinion, but the comparability of the sales relied on was not controverted. *Department of Transportation v. Amoco Oil Co.* (1988), 174 Ill. App. 3d 479, 528 N.E.2d 298, however, where the comparability of the sales was controverted, held that the trial court had the discretion to determine whether the information underlying the expert's opinion was reasonably relied upon, although no determination was required. (174 Ill. App. 3d at 491.) Therefore, under *Beeson* and *Amoco*, a valuation expert should be allowed to testify specifically to all sales reasonably relied on, subject to the trial court's discretion to exclude prejudicial or confusing information. See *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.* (5th Cir. 1984), 739 F.2d 1028; *Bauman v. Centrex Corp.* (5th Cir. 1980), 611 F.2d 1115.

■ Here, the owners argue that the trial court misapplied *Beeson* in allowing Curtis' testimony because, as the owners maintain, the Wolf Road Prairie sales were not comparable. But *Beeson* was not implicated because the Wolf Road Prairie sales were independently admitted as evidence of the subject lots' value; Curtis relied on admissible evidence. Even had the Wolf Road Prairie sales not been admitted, there was no error in allowing Curtis to testify to his reliance because the sales were comparable and of the type upon which valuation experts reasonably rely.

■ The owners further maintain that Curtis' testimony should have been stricken because he admitted that he did not know whether the parties to the Wolf Road Prairie sales were informed buyers and sellers, but it is well settled that an expert need not interview the specific buyers and sellers to rely on a given sale. (*Department of Public Works & Buildings v. Hufeld* (1966), 68 Ill. App. 2d 120, 215 N.E.2d 312.) Here, Curtis had inspected the subject lots, inspected

public records and sales contracts, and had heard testimony by the owners concerning their purchases and sales of the lots, activities sufficient to support his opinion testimony. (*Lake County Forest Preserve District v. Bank & Trust Co.* (1982), 106 Ill. App. 3d 856, 436 N.E.2d 237, *appeal denied* (1982), 91 Ill. 2d 570.) Curtis' testimony was properly admitted.

The owners next argue that the trial court misapplied *Beeson* in excluding James Paul's testimony concerning the Woodland View and Mayfair subdivision sales, upon which he relied to form his opinion that the subject lots were worth $24,750 each. This argument presents a proper application of *Beeson* and *Amoco*, but the trial court was within its discretion in not allowing testimony concerning the Woodland View and Mayfair sales because they were not comparable.

■■ The Woodland View and Mayfair subdivisions are located east of Wolf Road from Wolf Road Prairie. The land is physically similar to Wolf Road Prairie, and the lots were undeveloped when originally purchased. But the sales in Woodland View and Mayfair were of improved lots either developed or buildable, and approximately twice the size of the Wolf Road Prairie lots, meeting minimum size requirements for building set by Village of Westchester zoning ordinances. In contrast, the Wolf Road Prairie lots were unimproved, undeveloped, and did not meet minimum size requirements. Moreover, the subject lots lie in the flood plain of the Salt Creek. The Woodland View and Mayfair lots, developed, improved, and buildable, were not comparable. (See *Central Illinois Public Service Co. v. Gibbel*, (1978), 65 Ill. App. 3d 890, 382 N.E.2d 846, *appeal denied* (1979), 74 Ill. 2d 585.) Further, Paul had admitted in his deposition that the Woodland View and Mayfair lots were not comparable.

The owners contend that the Woodland View and Mayfair sales presented proper evidence of the value of the subject lots in their highest and best use, but the sales were not offered for that purpose. Rather, the sales were offered as the basis for Paul's opinion of the value of the subject lots in their present use. Because the Woodland View and Mayfair subdivision sales were not comparable, the trial court reasonably concluded that they were not sales of the type normally relied upon by experts, and was within its discretion to exclude testimony concerning the sales.

■ Finally, the owners argue that the trial court erred in denying their motion for directed verdict, arguing that IDOC failed to establish the value of the subject lots in their highest and best use, and therefore failed to establish a value necessary to maintain a condemnation action. This argument misconstrues the evidence. IDOC did not

attempt to establish a value at the highest and best use. Rather, IDOC sought to establish that the subject lots' highest and best use was as open space and that development, though possible, was infeasible, given the need for assemblage prior to that use, the need to rezone, the need to obtain building permits from the Army Corps of Engineers, and the prohibitive cost of installing streets and necessary utilities. Further, IDOC established a value for the subject lots in their present use. James Curtis testified that in his opinion, the three larger lots were worth $5,040 each, while the 10 smaller lots were worth $4,950 each. IDOC presented sufficient evidence to establish a value at the subjects lots' present use, and show that development was infeasible and not reasonably probable. There was no error in denying the motion for a directed verdict.

In conclusion, if a verdict in an eminent domain trial falls within the range of the minimum and maximum values testified to, it will be upheld (*Central Illinois Public Service Co. v. Rider* (1957), 12 Ill. 2d 326, 146 N.E.2d 48), unless a palpable mistake of law or clearly misleading evidence influenced the verdict. (*City of Chicago v. Vaccarro* (1951), 408 Ill. 587, 97 N.E.2d 766.) Here, the record contained testimony that the subject lots were worth as little as $4,950 per lot, and as much as $24,750 per lot. The jury returned a verdict of $5,450 per lot. There was no error of law, the owners' arguments notwithstanding. The Wolf Road Prairie sales were properly admitted as comparable sales and properly served as the basis for James Curtis' opinion testimony. The Woodland View and Mayfair subdivision sales were properly excluded. IDOC established a value for the subject lots in their present use. Aside from arguing that the Wolf Road Prairie sales were not comparable, the owners did not challenge any evidence as misleading or confusing. Therefore, the verdict setting the value of the subject lots at $5,450 per lot is affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.